*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LDDH, DCH, and KJDH, Minors.

UNPUBLISHED
October 10, 2024
10:09 AM

No. 368725
Wayne Circuit Court
Family Division
LC No. 2001-398887-NA

Before: CAMERON, P.J., and K. F. KELLY and GARRETT, JJ.

PER CURIAM.

After a child died while in respondent-father's care, the Department of Health and Human Services (DHHS) petitioned the family division of the circuit court to take jurisdiction over his three minor children, LDDH, DCH, and KJDH. Respondent-father had an extensive history of investigations by Children's Protective Services (CPS) because of his alcohol abuse, drug use, and his physical abuse and neglect of the children. After years of services through the DHHS, the family court terminated respondent-father's parental rights to DCH and KJDH pursuant to MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions that warranted the court's jurisdiction), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent), along with its finding that termination of his parental rights was in the children's best interests under MCL 712A.19b(5).[1] We hold that respondent-father's claims of error do not warrant reversal and, for that reason, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

The DHHS's initial petition for removal of the children contained allegations that respondent-father's home was uninhabitable, respondent-father had a history of numerous CPS

---

[1] The parental rights of the children's mother were terminated in 2013, and she is not a party to this appeal. The trial court did not terminate respondent-father's parental rights to LDDH because LDDH stated that his visits with respondent-father were appropriate and he expressed a preference to remain in respondent-father's home.

investigations, and that respondent-father neglected and improperly supervised the children. The petition further alleged that, on May 1, 2020, respondent-father was caring for RR, the eight-year-old son of respondent-father's long-term partner. Respondent-father let RR ride a motorized minibike without wearing any protective gear, even though RR did not know how to control the bike. RR drove the minibike into the street and collided with a sport utility vehicle. RR died from his injuries at Children's Hospital of Michigan in Detroit. Staff at the hospital observed that respondent-father appeared intoxicated and that he smelled of alcohol, marijuana, and gasoline.

Because respondent-father was under the influence of alcohol while supervising the children, the DHHS petition alleged that his alcohol abuse placed his children at risk of harm. The petition further alleged that, although COVID-19 restrictions prevented a DHHS worker from entering respondent-father's house on Nevada Street, the worker saw that the house had three broken windows, "the home appeared unkempt, and there was no refrigerator." A week later, in response to a request by the DHHS worker, respondent-father sent some photographs of the house that showed "broken windows, filthy surfaces, and a hole in the roof." Respondent-father told the DHHS worker that he was renovating the kitchen, but he also admitted that he had no kitchen appliances, and that he either ordered food or used a hot plate or grill to prepare meals. The house also lacked heat, gas, and water service, and the children had to urinate outside and defecate into buckets. The DHHS also discovered that the house had exposed electrical wires, the children slept on mattresses on the floor, and items in the house were in disarray.

The petition further alleged that, over several years, CPS found numerous instances of respondent-father's physical abuse of the children, failure to protect, threatened harm, neglect of the home, and improper supervision. Around the time the DHHS filed the petition in this case, respondent-father failed to correct two substantiated CPS cases of physical neglect of the children because of conditions in the house. In 2012, respondent-father lost custody of the children for a period of time when his medical neglect caused DCH to lose vision in one eye and the DHHS learned that respondent-father left the very young children alone for extended periods of time. The children returned to respondent-father after he completed a service plan, but CPS conducted various other investigations of respondent-father between 2013 and 2018.

A worker visited respondent-father's home in 2017 and found that the front door of the house was broken and the house had no water. In 2018, CPS received another report of abuse, neglect, and improper supervision of the children. At that time, a worker noted fire damage to the house, a fly infestation, and dog feces on the floor. Although in both 2017 and 2018 respondent-father received assistance to make home repairs, he failed to do so. The petition stated that respondent-father also had felony convictions in 2005 and 2010 for manufacture and delivery of controlled substances, and a probation violation. The DHHS concluded that respondent-father's failure to complete or benefit from prior services created a risk of harm to the children. For that reason, the DHHS sought jurisdiction over the children pursuant to MCL 712A.2(b)(1) and (2), and termination of his parental rights pursuant to MCL 712A.19b(3)(g) and (j).

Following a hearing, the trial court authorized the petition, but did not remove the children from respondent-father's custody. Instead, the court ordered respondent-father not to keep the children in the derelict house on Nevada Street, but allowed him to move the children into his partner's home after she told the court he could do so. Respondent-father argued that he did not need counseling and that he took three parenting classes during his previous cases involving the

-2-

DHHS and he did not need to repeat them, but the trial court ordered respondent-father to participate in numerous services, including parenting classes, counseling, and drug screens. Respondent pleaded no contest to the allegations in the initial petition.

The court held periodic hearings over seven months, through January 26, 2021, during which the caseworkers reported that respondent-father did not regularly complete drug screens, he did not comply with services, he moved out of his partner's house, and he did not tell case workers where he took the children. On February 24, 2021, CPS received a complaint that respondent-father and the children moved back into the Nevada Street house. The complaint stated that, on February 23, 2021, respondent-father entered the house while inebriated and angry and he severely beat LDDH for running away to a neighbor's house. LDDH's eye was swollen shut and bore red and black marks, he had bruises on his chest and arms, and his eyeglasses were broken. When the caseworker and a police officer went to the Nevada Street house to investigate, they discovered that the children's biological mother was there even though her parental rights were terminated years earlier. Respondent-father told authorities that he could not keep the children away from their mother. The investigation also revealed that the house remained uninhabitable.

The DHHS filed a supplemental petition to remove the children based on respondent-father's severe physical abuse of LDDH and the condition of the house. The supplemental petition also alleged that respondent-father failed to provide proper care, his continued custody created a substantial risk of harm to the children, and respondent-father impermissibly allowed the mother to have contact with the children. At the hearing on the supplemental petition, KJDH testified that respondent-father wanted him to lie and say that LDDH hurt his eye when he fell on a dumbbell. LDDH testified that respondent-father hit him in the abdomen and arm, but denied that respondent-father hit his face, and he maintained that he fell down and accidentally struck his eye on a dumbbell that was on the floor.

KJDH described the altercation in detail, however, because he witnessed it. KJDH testified that respondent-father punched LDDH hard, threw him around the room, and hit LDDH in the eye with his fist. According to KJDH, respondent-father "was really mad and trying to hurt him." KJDH found the incident extremely upsetting and said he was afraid and crying because he could not help his brother and that the incident left his room in a mess. KJDH further disclosed that every time respondent-father drank too much alcohol, he would hit the children. KJDH also stated that respondent-father told the children to lie about living in the Nevada Street house.

The supplemental petition further alleged that the Nevada Street house lacked heat, water, and gas, the exposed wires remained a hazard as well as broken windows and clutter throughout. Respondent denied those allegations, but KJDH verified them and also confirmed that the children urinated outside the house and defecated in buckets. The supplemental petition further alleged that respondent-father did not benefit from individual counseling, grief counseling, family counseling, substance-abuse counseling, Clinic for Child Study assessment, or drug screens that the DHHS offered.

The trial court authorized the supplemental petition and ordered the DHHS to remove the children from respondent-father's care. The DHHS initially placed the children together, but LDDH, the oldest of the three boys, could not adjust to the foster home, and the DHHS eventually moved him to a relative's home. Hearings and the offer of services continued for another two

years. Throughout the case, respondent-father did not consistently comply with drug screens. He missed numerous screens, and the majority of the screens he submitted were positive for alcohol and THC.[2] The trial court stated that it would not penalize respondent-father for testing positive for THC, but that alcohol remained a concern. Respondent-father tested positive for alcohol in every screen he took in 2023. Nonetheless, respondent-father denied consuming alcohol, denied he had a drinking problem, and maintained that all of the positive alcohol screens in 2023 were wrong. He stated that he did not believe KJDH's testimony that he was afraid of respondent-father and argued that the foster parents were "coercing" KJDH to say that.

The court permitted respondent-father to have supervised parenting time at the DHHS office and the court again ordered respondent-father to take parenting classes. A major goal for respondent-father was to learn empathy for his children. But respondent-father's inappropriate behavior at parenting time visits showed that he did not benefit from services. DCH and KJDH testified that respondent-father was angry and abusive. At one visit with respondent-father, KJDH cried and ran out of the room, and then refused to attend the next visit. At that next visit, DCH became very upset, and that visit ended early. At another visit, respondent-father bullied the children about their testimony that they did not want to come home to him. Service providers also told the DHHS that family therapy was detrimental to the children because of respondent-father's behavior. DCH and KJDH testified repeatedly that they loved respondent-father, but did not want to return home to him because of his substance abuse and violence. DCH and KJDH said they were happy in their foster home and that they wanted their foster parents to adopt them.

Despite more than three years of hearings and the numerous services offered and provided by the DHHS, respondent-father never accepted any responsibility for the removal of the children, he denied that he abused them, he denied consuming alcohol, and he accused DCH, KJDH, and the caseworkers of lying.

The DHHS filed a second supplemental petition seeking termination of respondent-father's parental rights. At the hearing on that petition, respondent-father denied all the allegations, including that he ever hit DCH and KJDH. Respondent-father stated that he showed his children "a lot of empathy," that allegations against him were taken out of context, and he complained that the DHHS made too much of events that occurred two years earlier.

Following the hearing, the court ruled that there was clear and convincing evidence to support termination of respondent-father's parental rights under MCL 712A.19b(3)(c)(*ii*), (g), and (j). The trial court conducted a hearing on the best interests of the children and ruled that termination of respondent-father's parental rights was in the best interests of DCH and KJDH, and it entered an order terminating his parental rights to them. However, because LDDH clearly

---

[2] Although respondent-father's chronic alcoholism was his most significant problem with substance abuse, we note that some of his drug tests also showed the presence of cocaine, benzodiazepine, and amphetamine.

informed the trial court and caseworkers that he wanted to return to respondent-father's care, the trial court did not terminate respondent-father's parental rights to LDDH.[3]

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent-father contends that the trial court clearly erred by finding clear and convincing evidence to support termination of his parental rights to DCH and KJDH under MCL 712A.19b(3)(c)(*ii*), (g), and (j). He argues that the trial court failed to consider that he complied with and completed his parent-agency treatment plan, he complied with drug screens, he benefited from services, and he rectified the conditions that caused the children to come within the court's jurisdiction, and he proved that he could provide proper care and custody of the children. We disagree.

### A. STANDARD OF REVIEW

"To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Keillor*, 325 Mich App 80, 85; 923 NW2d 617 (2018); *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). "This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). See also MCR 3.977(K). A trial court's findings of fact are clearly erroneous if "we are definitely and firmly convinced that it made a mistake." *In re White*, 303 Mich App at 709-710. This Court "defer[s] to the special ability of the trial court to judge the credibility of witnesses." *Id*. at 711.

### B. LEGAL PRINCIPLES

As discussed, the court terminated respondent-father's parental rights under MCL 712A.19b(3)(c)(*ii*), (g), and (j), which provide as follows:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> * * *

---

[3] The DHHS has not appealed the family court's decision not to terminate respondent-father's parental rights to LDDH.

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's ages.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The petitioner must prove at least one ground for termination. *In re Trejo*, 462 Mich 341, 351; 612 NW2d 407 (2000); *In re Moss*, 301 Mich App 76, 88l 863 NW2d 182 (2013). In *In re Gazella*, 264 Mich App 668, 676; 692 NW2d 708 (2005), this Court explained as follows:

[I]t is not enough to merely go through the motions; a parent must benefit from the services offered so that he or she can improve parenting skills to the point where the children would no longer be at risk in the parent's custody. In other words, it is necessary, but not sufficient, to physically comply with the terms of a parent/ agency agreement or case service plan. For example, attending parenting classes, but learning nothing from them and, therefore, not changing one's harmful parenting behaviors, is of no benefit to the parent or child.

The respondent "must take responsibility for his own past failures." *In re Mason*, 486 Mich 142, 168; 782 NW2d 747 (2010). Although the DHHS has a responsibility to make reasonable efforts to provide reunification services, there is a commensurate responsibility on the part of a parent to participate in and benefit from any offered services. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App at 710. Under Subsection (3)(j), the harm in question need not be physical; a risk of emotional harm is sufficient. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

-6-

## C. DISCUSSION

We agree with the trial court's ruling that clear and convincing evidence showed that respondent-father received recommendations and services to rectify the conditions that brought the children within the jurisdiction of the court, respondent-father had a reasonable opportunity to rectify the conditions but did not do so, and that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering the children's ages. MCL 712A.19b(3)(c)(*ii*). See also MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist).

There was also clear and convincing evidence to support termination under MCL 712A.19b(3)(j). Ample evidence showed that the children suffered harm while living with respondent-father. He became inebriated often and, while inebriated, he physically assaulted the boys, which caused them to live in terror. Clear and convincing evidence also showed that, for years, respondent-father maintained an unfit home for the children that lacked basic utilities, was structurally unsafe, and lacked a working bathroom. During the pendency of this case, respondent-father also demonstrated no benefit from the services provided to him. He continued his abusive behaviors toward the children during parenting time visits in front of caseworkers by bullying, yelling at, and threatening the children, and the children repeatedly told the caseworker that they did not want to attend parenting time visits with respondent-father. Moreover, respondent-father never acknowledged or took responsibility for any of his negative behaviors or their impact on the children. Instead, he accused the children of lying, he asserted that they were brainwashed, and he repeatedly dismissed their concerns. This evidence showed that the children would be at significant risk of harm if returned to respondent-father's care.

We agree with respondent-father that, pursuant to MCL 712A.19b(3)(g), the trial court failed to address whether he was "financially able" to provide proper care and custody for the children as required by the statute. However, because the trial court need only find one statutory ground for termination to support its termination of parental rights, *Schadle*r, 315 Mich App at 410, and the trial court did not clearly err by ruling that termination of respondent-father parental rights was justified under § 19b(3)(c)(*ii*), and (j), we hold any error in the trial court's reliance on § 19b(3)(g) as an additional ground for termination was harmless.

## III. BEST INTERESTS OF THE CHILDREN

Respondent-father argues that the trial court erred by ruling that a preponderance of the evidence established that termination of his parental rights was in the best interests of the children. Again, we disagree.

## A. STANDARD OF REVIEW

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. The trial court's ruling regarding best interests is reviewed for clear error. *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016). "A finding of fact is clearly

erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Moss*, 301 Mich App at 80.

## B. LEGAL PRINCIPLES

Under MCL 712A.19b(5), "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." The trial court must weigh the evidence on the whole record in determining the child's best interests. *Trejo*, 462 Mich at 356-357. It may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Olive/Metts,* 297 Mich App at 41-42 (citations omitted). "A parent's substance-abuse history is also relevant to whether termination is in the child's best interest." *In re Rippy*, 330 Mich App 350, 361; 948 NW2d 131 (2019).

Other best-interest considerations include the length of time the child has been in foster care or placed with relatives, the likelihood that "the child could be returned to [the] parents' home within the foreseeable future, if at all," and compliance with the case-service plan. *Frey*, 297 Mich App at 249. In addition, the court may consider a parent's history of domestic violence, the parent's visitation history with the child, the child's well-being while in care, and the prospects for adoption. *Pederson¸* 331 Mich App at 445, 476; 951 NW2d 704 (2020). As this Court explained in *In re Moss*, 301 Mich App at 89, "once a statutory ground for termination is established, i.e., the parent has been found unfit, the focus shifts to the child and the issue is whether parental rights *should* be terminated, not whether they can be terminated." For that reason, "at the best-interest stage, the child's interest in a normal family home is superior to any interest the parent has." *Id.*

## C. DISCUSSION

Throughout the proceedings and in his brief on appeal, respondent-father asserted that he complied with, and demonstrated benefit from, everything the court and the DHHS asked him to do. According to respondent-father, he fixed the house and he "made improvements in his life to be ready for the return of his sons." Respondent-father further asserted that he did not use physical discipline with the children, he did not drink alcohol, he did not behave irresponsibly, and the record did not disclose any risk of harm to the children. Our review of the record shows that respondent-father's assertions are not supported by the evidence and that the evidence strongly supported the trial court's conclusion that termination of respondent-father's parental rights was in the best interests of the children.

Respondent-father cites *In re Baham*, 331 Mich App 737, 758-759; 954 NW2d 529 (2020) to support his claim, in which this Court stated:

> Again, the record reflects that—despite her prior history—respondent was compliant with services and was seeking out additional services. She was demonstrating appropriate parenting during the parenting-time visits and was making plans for how to support herself and [the child] in the future, including by

earning a GED and attending vocational school while in prison. Her family was supportive of her, both financially and emotionally, and would visit her at the prison. Respondent's behavior in prison was exemplary, with the prison staff reporting that she had no tickets and was not causing any trouble. In light of respondent's undisputed progress toward reunification, to the extent that the court found a *reasonable* probability of harm to [the child] if returned to respondent's care, the court's finding was clearly erroneous. [*Id*. at 758-759.]

We hold that respondent-father reliance on *Baham* is misplaced because this case is plainly factually distinguishable. Simply stated, the evidence in this record does not support respondent-father's contention that he made progress in his service plan or benefited from any of the many services provided. Instead, the evidence shows that respondent-father did not comply with the requirements of his parent-agency treatment plan. As discussed, respondent-father continued to drink alcohol, he engaged in threatening and otherwise inappropriate behavior during parenting time visits, and he failed to accept any responsibility for his actions that resulted in the removal of the children. For more than three years, the DHHS provided respondent-father with services and he never demonstrated sufficient benefit to be allowed unsupervised visitation with the children. He also continued to argue with the children, his case workers, and the court.

By the time the court considered the best interests of the children, DCH and KJDH had spent over two years in their foster home. They both expressed how much they appreciated living in a stable home with a family that addressed their needs and showed them love and affection. The boys wanted and needed the permanency and stability of that home. DCH and KJDH stated that respondent-father frightened them because of his behavior during parenting time, and they often preferred not to see respondent-father at all. In addition, the boys clearly understood that respondent-father did not make the changes required of him. Not only did respondent-father continue to abuse alcohol, he lied and accused the children of lying about him, and he was argumentative toward them at most of his parenting time visits.

Although respondent-father told the trial court that he had learned to be "more patient," his behavior during visits showed no improvement. Despite having years of services to make changes, no evidence showed that respondent-father would rectify the abusive and unhealthy conditions he created and he showed no ability to understand or prioritize the needs of the children. The trial court did not err in finding by a preponderance of the evidence, that termination of respondent-father parental rights was in the best interests of DCH and KJDH.

Respondent-father contends that the court should have ordered a guardianship for the children so that DCH and KJDH could continue their relationship with respondent-father and their half-brother, LDDH. A court may appoint a guardian if it is in the best interests of the children. MCL 712A.19c(2). In making this determination, "the court may consider the best-interest factors . . . or any other factors that may be relevant under the circumstances of a particular case." *In re COH, ERH, JRG, & KBH*¸ 495 Mich 184, 208; 848 NW2d 107 (2014). However, "the appointment of a guardian is only appropriate after the court has made a finding that the child cannot be safely returned to the home, yet initiating termination of parental rights is clearly not in the child's best interest." *In re TK*¸ 306 Mich App 698, 707; 859 NW2d 208 (2014), citing MCL 712A.19a(7)

and MCR 3.979(A).  After that finding, "the court must find that it is in the child's best interest to appoint a guardian."  *Id*.

In this case, as discussed, more than a preponderance of evidence established that termination of respondent-father's parental rights was in the best interests of the children.  Further, the court considered and addressed the possibility of a guardianship, but neither the children nor their foster parents wanted to participate in a guardianship.  They instead wanted permanency, structure, and consistency.  DCH and KJDH were teenagers and could now clearly explain to the court that they wanted respondent-father's parental rights terminated and they wanted to be adopted by their foster parents.  In addition, the foster parents clearly stated their preference for adopting the boys.  This, and respondent-father's demonstrated unwillingness to change or to acknowledge the impact of his behavior on the children supported the trial court's ruling that a guardianship was not appropriate because termination of respondent-father's parental rights was clearly in the best-interest of the children.

Affirmed.

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Kristina Robinson Garrett